UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. C 08-00164 MHP |
| Plaintiff, | |
| v. | **MEMORANDUM & ORDER** |
| W. SCOTT HARKONEN, | **Re: Defendant's Motions in Limine re: "Labeling" and to Exclude Protected First Amendment Speech or, In The Alternative, to Dismiss the Indictment** |
| Defendant. | |

A grand jury indicted defendant W. Scott Harkonen ("Harkonen") for fraudulently promoting the drug Actimmune® (interferon gamma-1b) by putting out false and misleading information about the drug's effectiveness in treating idiopathic pulmonary fibrosis ("IPF"). The indictment charges one count of wire fraud and one count of misbranding under the Food, Drug, and Cosmetic Act. Now before the court are two motions in limine re: "labeling" and to exclude protected First Amendment speech, or alternatively, to dismiss the indictment. Having considered the parties' arguments and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

Harkonen is a resident of California who served as the Chief Executive Officer ("CEO") of InterMune, Inc. ("InterMune"), a pharmaceutical company based in the Bay Area, from February

1998 through June 2003.  Harkonen was also a member of InterMune's Board of Directors from February 1998 through September 2003.

In 2004, the Department of Justice ("DOJ") began an investigation into allegations that InterMune marketed and promoted the sale of its drug Actimmune® for the treatment of IPF, an indication for which the drug had not been approved by the Food and Drug Administration ("FDA"). Actimmune® was approved by the FDA to treat chronic granulomatous disease in or about 1990, and was also approved to treat severe, malignant osteopetrosis in or about 2000.  Both of these diseases are rare disorders that primarily affect children.  By contrast, IPF is a fatal lung disease that affects mainly middle-aged people.

When the FDA approves a drug, it does so for a particular use or "indication." That indication will be included on the drug's label or package insert and the drug may be marketed only for the indications that appear on the label.  See 21 U.S.C. § 355(b)-(d).  The Food, Drug, and Cosmetic Act ("FDCA") makes it illegal to market, advertise or otherwise promote an indication for which the FDA has not approved the drug and that is not on the drug's FDA-approved label, i.e., an "off-label" use.  See 21 U.S.C. §§ 301-99.  Promoting an off-label use of a drug renders it misbranded.  21 U.S.C. § 352 (f).  A drug is misbranded if its labeling or advertising is "false or misleading in any particular."  21 U.S.C. §§ 352(a), 321(n).

In March 2008, Harkonen was indicted for disseminating and causing to be disseminated information regarding Actimmune® for the treatment of IPF with the intent to defraud and mislead, thereby causing Actimmune® to be misbranded.  The first count of the two-count indictment charges Harkonen with violating the federal wire fraud statute, which makes it unlawful to "devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" and use "wire, radio, or television communication in interstate or foreign commerce" in furtherance of that scheme. 18 U.S.C. section 1343.  The second count charges Harkonen with making false and misleading statements and doing acts, with "intent to defraud or mislead," resulting in drugs being misbranded while held for sale following shipment in interstate commerce under the FDCA.  21 U.S.C. §§ 331(k), 333(a)(2) and 352(a).

2

According to the indictment, in October 1999, the *New England Journal of Medicine* published the results of Austrian study of eighteen participants that concluded interferon gamma-1b had anti-fibrotic properties and the lung function of the nine patients who received interferon gamma-1b improved. The study also stated that a larger, more scientifically controlled study was needed to test whether the results were valid.

In October 2000, InterMune began a Phase III clinical trial (named the GIPF-001 trial) to determine whether treating IPF patients (patients with fibrotic scar tissue in their lungs) with Actimmune® was effective. In August 2002, data from that clinical trial failed to show that Actimmune® was effective in treating IPF. Harkonen discussed the results of the trial with his staff at InterMune and instructed them to conduct additional analyses in an effort to ascertain whether Actimmune® might be efficacious for certain subgroups of the patient population. This after-the-fact subgroup analysis suggested a survival trend for patients whose IPF was described as "mild to moderate."

In late August 2002, Harkonen and some InterMune employees discussed the results of the GIPF-001 Phase III trial and additional subgroup analyses of patient deaths with the FDA. The FDA's medical reviewers advised Harkonen that the trial data were not sufficient to gain FDA approval for Actimmune® to treat IPF and that further clinical testing would be required to determine whether Actimmune® could reduce or delay death for IPF patients. Thereafter, Harkonen began discussions with the FDA regarding the design of another trial targeted at patients with mild to moderate IPF. In December 2003, InterMune began enrolling a subgroup of such patients in a Phase II clinical trial and in 2007 InterMune announced it was discontinuing the study because it did not benefit the patients.

According to the indictment, beginning in or about October 2000, Harkonen and others at InterMune began to promote the use of Actimmune® to treat IPF by misrepresenting the import of the earlier data. On August 28, 2002, InterMune issued a nationwide press release publicly announcing the results of the GIPF-001 Phase III clinical trial. Harkonen wrote the headline and byline and controlled the content of the entire press release. The headline stated that: "InterMune Announces Phase III Data Demonstrating Survival Benefit of Actimmune in IPF," with the

3

subheading "Reduces Mortality by 70% in Patients With Mild to Moderate Disease." The press release was distributed by e-mail from an InterMune executive to the company's sales representatives, along with a document instructing the sales representatives how to discuss the press release with doctors.

InterMune, with the knowledge and approval of Harkonen, hired a marketing firm to determine whether the press release would affect pulmonologists' (doctors who treat lung cancer) willingness to prescribe Actimmune® to treat IPF. The firm reported survey results indicating that the press release would have a positive impact on the likelihood of such prescriptions. Harkonen and others at InterMune established sales goals for Actimmune® and sent sales representatives to visit pulmonologists and provided incentive and bonus plans for sales representatives based upon the number of Actimmune® prescriptions written by those doctors. At the direction of Harkonen, T-shirts were distributed to InterMune sales staff and other employees at a party to celebrate the announcement of the trial results. The front of the T-shirt stated: "ACTIMMUNE GIPF-001 IPF" and the back stated: "FEEL BETTER LIVE LONGER."

Harkonen and others also assisted and caused the dissemination by a specialty pharmacy in Florida of information to patients and doctors about the claimed efficacy of Actimmune® for treating IPF. That pharmacy sent a "fax blast" with the press release to more than 2,000 pulmonologists. That same pharmacy also distributed to patients who took Actimmune®, along with their medications, a letter containing information from the press release stating that "preliminary data" had shown:

> . . . a statistically significant reduction in mortality by 70% in patients with mild to moderate IPF. Interferon-gamma-1b is the first treatment ever to show any meaningful impact in this disease in clinical trials. These results indicate that Actimmune® should be used early in the course of treatment of this disease in order to realize the most favorable long-term survival benefit.

Overall, these marketing efforts were successful. Between 2000 and 2003, Actimmune® sales increased significantly, from $11 million in 2000 to $141 million in 2003. The majority of these sales were attributable to prescriptions for the off-label treatment of IPF.

Harkonen now moves to dismiss the indictment, or in the alternative, in limine to establish the parameters of the trial in this action with regard to two issues: "labeling" and

4

First-Amendment-protected speech. Specifically, Harkonen argues that the press release, related communications and other iterations charged as disseminations should be excluded from evidence because (1) they cannot constitute impermissible "labeling" within the meaning of the FDCA and (2) they are speech protected under the First Amendment. Alternatively, Harkonen requests that the court dismiss the indictment in its entirety because the government cannot prove the charges without inadmissible evidence and that which relies on constitutionally-protected speech the FDA cannot lawfully prohibit.

The government argues that both motions should be denied because the charged counts require the government to prove that Harkonen disseminated false and misleading information with an intent to defraud or mislead. Because the information and materials cited in the indictment clearly constitute "labeling" under the FDCA and the First Amendment does not protect fraud, the government contends that it sustains the right to present the case to a jury for decision on the merits.

LEGAL STANDARD

The Federal Rules of Criminal Procedure permit a defendant to "raise by pretrial motion any defenses, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b); United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986). In considering a motion to dismiss, the court is limited to the face of the indictment and must presume the truth of the allegations in the charging instrument. United States v. Caicedo, 47 F.3d 370, 371 (9th Cir. 1995); United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982). In addition, "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence." United States. v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996) (citation omitted). "A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence . . . . The Court should not consider evidence not appearing on the face of the indictment." Id. A court must decide such a motion before trial "unless it finds good cause to defer a ruling." Fed. R. Crim. P. 12(d); Shortt Accountancy, 785 F.2d at 1452 (if the motion "is substantially founded upon and intertwined with evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred.")

5

## DISCUSSION

### I. The First Amendment

Harkonen argues that the press release and all related communications alleged in the indictment, including statements and disseminations of information from or about the press release, constitute scientific opinions that are entitled to protection under the First Amendment. Harkonen alleges the speech at issue is either pure scientific speech, or it is inextricably intertwined as mixed scientific and commercial speech, or even if it is commercial speech it is still protected by the First Amendment under any of the applicable standards. Harkonen alleges that because the disseminations form the actual criminal acts charged in the indictment, there can be no stated offense without the protected speech and the indictment should be dismissed or, in the alternative, the disseminations should be excluded as evidence of Harkonen's culpability at trial.

The government asserts that Harkonen's argument that his statements are constitutionally protected because they are not fraudulent goes directly to the merits of the factual allegations of the case. The indictment charges Harkonen with violating the FDCA by causing Actimmune® to be misbranded with "intent to defraud or mislead" and a drug is misbranded if its labeling is "false or misleading in any particular." 21 U.S.C. §§ 331(k), 333(a)(2), 352(a). The indictment also charges Harkonen with wire fraud, under 18 U.S.C. section 1343. In the Ninth Circuit, "[w]ire fraud has three elements: a scheme to defraud, use of the wires in furtherance of the scheme, and the specific intent to defraud." United States v. McNeil, 320 F.3d 1034, 1040 (9th Cir. 2003). Because the allegations allege fraud, and the First Amendment does not protect fraud, the government contends it is for the jury to decide whether those allegations have been proven beyond a reasonable doubt.

The court recognizes that "the First Amendment does not shield fraud." Illinois, ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600, 612 (2003); Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557, 593 (1980) (holding that "false and misleading" speech is unprotected by the First Amendment). Contrary to the government's allegation, however, this does not mean that a prosecution for fraudulent misbranding "cannot present First Amendment concerns." The court must do more than accept the government's legal

6

1 conclusions and must test the indictment by its sufficiency to charge an offense.  U.S. v. Boren, 278
2 F.3d 911, 914 (9th Cir. 2002).

3        On its face, the indictment charges Harkonen with violating the federal wire fraud statute and
4 the FDCA by devising a scheme to defraud and by making fraudulent statements and disseminating
5 false and misleading information about the efficacy of Actimmune® to treat IPF.  The court
6 interprets Harkonen's motion as contending that the indictment cannot state an offense because it
7 relies on an interpretation of statutes that is overbroad as applied to Harkonen's conduct and
8 infringes on his First Amendment right to make statements of a scientific position and promote
9 scientific discourse.  On oral argument, Harkonen summarized his position by stating "the First
10 Amendment does not allow criminalization of opinions."  Harkonen urged the court to act as a
11 gatekeeper and determine whether the speech in question is protected under Reilly v. Pinkus, 338
12 U.S. 269, 273-74 (1949), as scientific speech about "medical practices in fields where knowledge
13 has not yet been crystallized in the crucible of experience" and where there exists "no exact standard
14 of absolute truth by which to prove the assertions false and a fraud."  The government's position is
15 that this entire First Amendment motion is nothing more than a red herring, because neither the
16 government nor the FDCA seeks to make criminal good-faith scientific debate.

17        Plainly, Harkonen is seeking to protect more than just good-faith scientific debate.  Harkonen
18 is requesting that the court deem protected a series of communications, namely, the content of a
19 press release and its related disseminations.[2]  Accordingly, this First Amendment protection issue
20 raises an appropriate, albeit limited, question for the court to consider.  While the court must accept
21 as true the government's factual allegations of fraud, the court need not accept the fraud charges
22 outright and without review of whether the alleged speech or conduct supporting the fraud charges
23 in the indictment is entitled to complete protection under the First Amendment so as to require
24 dismissal.  Harkonen asserts the court need not invalidate any statute regulation or rule in making
25 such a determination.  This is true, because case law has already established the outer bounds of, or
26 "safe harbor" carve-out from, liability under the FDCA for First Amendment protected speech.
27 Accordingly, the court must assess whether the alleged speech at issue is wholly protected as a
28 matter of law.

7

### A. The Speech At Issue

The law provides a boundary for what drug product-related speech the government may prohibit. While the FDCA prohibits speech that promotes off-label uses for approved drug products (which thereby "misbrands" the drug), the government cannot wholesale proscribe the open dissemination of scientific opinions and ideas concerning all beneficial uses for approved drug products. Such a prohibition has been deemed to violate the First Amendment rights of the speakers to communicate scientific information and engage in scientific discourse about such products. See Wash. Legal Found. v. Friedman, 13 F. Supp. 2d 51, 74 (D.D.C. 1998) (holding certain FDA restrictions on the promotion of off-label uses an unconstitutional restriction on commercial speech that communicates and promotes scientific conclusions to a physician audience), *order vacated as moot sub nom.* Wash. Legal Found. v. Henney, 202 F.3d 331, 334 (D.C. Cir. 2000) (noting the prior judgment rendered moot in part by superceding legislation).

In a tortured series of litigations over the bounds of the government to infringe upon a drug manufacturer's freedom to communicate information about its products, the government asserted it had "established a procedure for manufacturers who distribute certain materials regarding off-label uses in such a way that they will not be used as evidence against them in a prosecution under the misbranding provisions." Henney, 202 F.3d at 336. The government recognized that a "safe harbor" existed for industry-supported scientific and educational speech and associated conduct concerning drug products, id. at 335, while the D.C. Circuit recognized in *dicta* that a drug manufacturer "may still argue that the FDA's use of a manufacturer's promotion of off-label uses as evidence in a particular enforcement action violates the First Amendment." Id. at 336.

With the case law still in an unsettled state, see, e.g., United States v. Caputo, 517 F.3d 935, 939 (7th Cir. 2008); Caronia, 576 F. Supp. 2d at 394, this would present a thorny issue for the court were it not for the fact that the allegations of the indictment do not trench anywhere near the outer bounds of speech deemed controversial. As best can be gleaned from the case law and from the government's position in prior cases and in this case, speech is protected by the First Amendment if it is a *bona fide* scientific and educational speech that appears in independent and peer-reviewed sources, such as a journal article reprint or a medical textbook. While questions remain about when

8

such "pure" speech gets converted to a "less pure" form of commercial speech when a drug company is involved, e.g., by funding the studies or by disseminating the speech through various promotional activities, they are of no moment here because nowhere does the indictment invoke any "pure" scientific speech.

The mere fact that Harkonen is an M.D., that the press release he prepared presented actual data and statistical analyses, and that the dissemination of the press release may have generated vigorous debate in the pulmonological and pharmaceutical analyst community, do not disturb this conclusion. That the speech is a press release and not a peer-reviewed publication, that it refers to a specific commercial product on the market (Actimmune®), and that it was unquestionably disseminated for commercial benefit (e.g., the first line notes InterMune's Nasdaq stock symbol), are allegations that take the speech at issue outside the realm of pure science speech and move it towards the realm of commercial speech. See, e.g., Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66-68 (1983) (noting that factors such as whether the form of speech is an advertisement; whether it refers to a specific product; and whether there is a clear economic motivation behind the speaker's activities, provide strong support that the speech is commercial in nature). While commercial speech is entitled to "qualified but nonetheless substantial protection" under the First Amendment, see id., it is nevertheless not entitled to complete exemption from FDCA liability *per se*. See also, Thompson v. Western States Med. Ctr., 535 U.S. 357, 367 (2002). ("Although commercial speech is protected by the First Amendment, not all regulation of such speech is unconstitutional.")

On oral argument, Harkonen asserted that the press release's reference to data is the "heart of the cut-out for protected speech." The court disagrees. What the indictment alleges, and what the law does not protect as a First Amendment carve-out to liability under the FDCA, is that the press release and associated speech incorporates, reformats and post hoc reinterprets scientific results in a false and misleading manner and is then disseminated at Harkonen's direction to physicians and patients. As the government affirms, "the [d]efendant is under indictment not because he promoted Actimmune[®] for an unapproved use . . . but because he made knowingly false and misleading statements in doing so." Pl.'s Opp., Docket No. 104, at 13, n.3. The government is not barred from

9

1 proceeding with its case because the facts alleged do not entitle the speech at issue to complete First
2 Amendment protection.

### B.  The "Fraudulent" Nature of the Speech

Harkonen contended on oral argument that the speech at issue can never be fraudulent because, under Reilly, it is "no more than 'opinion' in a field where imperfect knowledge made proof 'as of an ordinary fact' impossible." 338 U.S. at 273. Harkonen argued that Reilly is the controlling case for this inquiry and the court should reach a decision pre-trial rather than post-trial because of the potentially "chilling effect" on speech. And yet, as the Supreme Court noted in the very case upon which Harkonen relies to argue for dismissal at this stage, the issues in fraud cases "*make cross-examination peculiarly appropriate*." Reilly, 338 U.S. at 276. "An intent to deceive might be inferred from the universality of scientific belief that advertising representations are wholly unsupportable; conversely, the likelihood of such an inference might be lessened should cross-examination cause a witness to admit that the scientific belief was less universal than he had first testified." Id. In so reasoning, the Court explicitly rejected the argument that a finding of fraud is barred "whenever there is the least conflict of opinion as to curative effects of a remedy." Id. at 273-274.

Following this reasoning, Harkonen's argument that a finding of fraud is barred here because the press release contains statements of scientific opinions and perspectives about the meaning of the clinical data is unavailing, because it is belied by the allegations in the indictment. Harkonen's argument that the press release merely represents inferences drawn from the subgroup analysis of the data that the government believes should not have been so drawn is premature at this stage of the proceedings. Harkonen cannot successfully argue that "imperfect knowledge" in the field somehow sanitized the press release's communication that the clinical trial data, albeit missing its primary endpoint, suggested a mortality benefit in a subgroup of IPF patients. At this stage, Harkonen cannot dispute that the FDA affirmatively disagreed that the subgroup analysis showed a benefit sufficient to gain FDA approval for Actimmune® to treat IPF and refused to accept that Actimmune® could reduce or delay death for IPF patients without further testing. It is not enough to carry the day here for Harkonen to cite case law that the government cannot criminalize the

10

dissemination of allegedly false scientific ideas or opinions. See, e.g., Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 803 (1988) (Scalia, J., concurring) ("[i]t is axiomatic that, although fraudulent misrepresentation of facts can be regulated, . . . the dissemination of ideas cannot be regulated to prevent it from being unfair or unreasonable").

Because Harkonen must accept the factual allegations as true for the purposes of this motion, he is hamstrung in his ability to go behind the allegations and challenge the merits of the facts alleged. Harkonen cannot argue that the statements are merely a scientific interpretation of data that would be accepted by the relevant health care community because the allegation in the indictment that the FDA's medical reviewers disagreed with this interpretation is in direct conflict with such an argument. This was not a mere statement by an FDA employee that did not represent the views of the FDA but rather, as alleged, it constituted the underlying basis for the FDA's refusal to approve Actimmune® to treat IPF. Harkonen's argument that the FDA may not establish scientific truth *vel non* is misplaced. The allegation goes to the non-approved status of Actimmune® in treating IPF and the fraudulent representations made in the press release and its disseminations in spite of this non-approved status.

The inclusion of a declaration with Harkonen's moving papers by Dr. Patrick Hannon, an expert statistician and physician who testifies to the merits of the press release's interpretation of the data, i.e., that the speech was *truthful*, admits its own impropriety at this stage. The court must accept the indictment's allegations that medical staff at the FDA advised Harkonen that the trial data were not sufficient to gain FDA approval for Actimmune® to treat IPF or to show that Actimmune® could reduce or delay death for IPF patients. Whether the press release and its iterations constituted puffery by Harkonen on behalf of InterMune or intentional misrepresentations of the data is an issue for trial that goes to the merits of the case.

Likewise, the court cannot accord weight to Harkonen's contention that the press release did no more than "merely describe the results of a clinical trial" and in no way presents any manufacturer-driven false and misleading statements. This interpretation urged by Harkonen is controverted by the allegations in the indictment that the press release falsely claims that the GIPF-001 trial results "demonstrated a survival benefit" of Actimmune® in IPF and that Harkonen

distorted the results in an intentional effort to deceive doctors and patients. The indictment charges Harkonen with felony violations of 21 U.S.C. section 331(k) done "with the intent to defraud or mislead" under 21 U.S.C. section 333(a)(2). Because the government explicitly alleges fraudulent intent, the court must at this stage accept the government's contention that it is neither seeking to restrict truthful, non-misleading promotion of the off-label uses of Actimmune®, nor attempting to regulate Harkonen or InterMune's ability to engage in a discourse on whether Actimmune® might someday prove beneficial as a treatment for IPF.

It is undisputed that the government has the right to regulate false and misleading statements made to doctors and patients about drug products in interstate commerce. Accepting the indictment's allegations as true for the purposes of this motion, it is clear to the court that the speech at issue is not outside the bounds of the FDCA's regulatory reach as being wholly protected by the First Amendment as a matter of law. Accordingly, the conduct associated with this speech, i.e., disseminating the press release and related communications, is also not outside the bounds of the FDCA. The court DENIES defendant's motion to dismiss the indictment and also DENIES defendant's alternative motion in limine to exclude the speech at issue. The allegations in the indictment will not be excluded on the basis that they seek to regulate the mere dissemination of ideas, because the conduct alleged is fraudulent in nature.

Having found that the alleged speech at issue is not First Amendment-protected as pure scientific speech or ideas, the court must allow the case to advance to a jury for determination of whether the government can prove the fraud charges based on speech that may be entitled to lesser protection under the First Amendment. The Supreme Court has made clear that in a First Amendment analysis of commercial speech under the Central Hudson test, the threshold matter is whether the speech "concerns unlawful activity or is misleading." Caronia, 576 F. Supp. 2d at 396-397, citing Western States, 535 U.S. at 367. It is not the case here that the factual allegations of the indictment concerning the press release and other communications are so clear that reasonable minds could not differ as to whether Harkonen committed fraud. Thus, the matter must be decided by a jury. See Facade v. Price Co., 70 F.3d 1078, 1081 (9th Cir. 1995) (whether a public statement

is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact unless it is "so obvious that reasonable minds [could] not differ").

II.     "Labeling"

Harkonen is charged with misbranding under the FDCA, which states that a drug "shall be deemed to be misbranded . . . if its labeling is false or misleading." 21 U.S.C. § 352(a). Harkonen contends that the press release and related communications alleged in the indictment—which include copies of the press release sent to InterMune sales force and disseminated by a third-party pharmacy, the results from the marketing firm assessing the impact of the press release, and T-shirts that were distributed to InterMune employees—do not constitute "labeling" as defined by the FDCA. Thus, Harkonen alleges the count of misbranding must be dismissed because it fails to state a statutory violation under the FDCA.

Harkonen argues all of these "communications" do not constitute labeling for two main reasons. First of all, because the communications did not "supplement or explain" the drug product itself, the communications do not provide the required guidance or assistance in the use of Actimmune®. As explained in Cartel v. United States, 335 U.S. 345, 350 (1948), which remains the leading Supreme Court authority on the scope of the labeling provision, labeling includes any literature or communication that accompanies an article (i.e. a drug product), and one thing is deemed to be "accompanied" by another when it "supplements or explains" it. Harkonen contends that the communications alleged in the indictment therefore do not constitute part of the labeling because they do not "perform the same function as [they] would if [they] were on the article or on the containers or wrappers." Id. at 351. Thus, in Harkonen's view, because the communications did not serve to guide or assist the purchaser in how to use Actimmune® or provide "substantial information about the use or benefit of the article," United States v. Hanafy, 302 F.3d 485, 490 (5th Cir. 2002), they did not constitute an essential supplement designed to be used with the product such that it can be classified as labeling under the FDCA. See United States v. Urbuteit, 336 U.S. 804, 806 (1949) (*per curiam*) (clarifying on appeal from remand that advertising material constituted

13

labeling where the "controlling factors were whether the leaflets were designed for use with the [product] and whether they were so used.")

Harkonen also argues the press release and communications in question are not "labeling" because they do not form part of an "integrated distribution program," as Kordel requires materials to be if they do not physically accompany the product. 335 U.S. at 350. Harkonen argues (a) the press release was not integrated as such because it was not presented in immediate connection with the prescription and/or actual purchase of the drug; (b) the T-shirts and e-mail distributed to InterMune's sales force were not integrated because they were internal only and any consequent oral statements made by the sales force to physicians were not in writing; (c) the marketing research results about the impact of the press release were not an integrated distribution program because they had nothing to do with actually distributing the product; and (d) the copies of the press release and letters distributed by the third-party pharmacy were not integrated because they were not controlled by Harkonen and were also not part of a program because they were only distributed for a short time.

Finally, Harkonen concludes that because the government failed to provide to Harkonen the constitutionally mandated fair notice that the aforementioned communications could be considered "labeling" within the meaning of the FDCA to trigger criminal liability, Harkonen is entitled to a dismissal of the indictment. Harkonen points to an FDA regulation on drug promotion that allegedly provides a "safe harbor of protection" for press releases, by stating "this provision is not intended to restrict the full exchange of scientific information concerning the drug, including dissemination of scientific findings." 21 C.F.R. § 312.7. Harkonen argues that the rule of lenity should be applied to any ambiguity that remains concerning the scope of what the FDCA and its accompanying regulations intended to encompass. See, e.g., Liparota v. United States, 471 U.S. 419, 427 (1985) (criminal statutes should be resolved in favor of lenity); United States v. Santos, 128 S.Ct 2020, 2028 (2008) ("the rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.")

In response, the government first asserts that dismissal of the indictment is inappropriate because the wire fraud charge has not been challenged. Second, the government contends the

14

1 materials or "communications" alleged in the indictment plainly constitute labeling within the
2 meaning of the FDCA.  The government argues it is undisputed that Harkonen shipped or caused to
3 be shipped in interstate commerce both Actimmune® and the information or "communications"
4 alleged in the indictment.  Because that information explains how the drug is to be used and shares a
5 common origin (InterMune) and a common destination (prospective and actual patients and doctors)
6 with the drug that formed part of an integrated distribution program, it qualifies as labeling within
7 the FDCA.  See Kordel, 335 U.S. at 348, 350.

### A.     The Scope of "Labeling" Under the FDCA

Upon reviewing the case law, the court finds this issue a relatively straightforward one.  The FDCA broadly defines labeling as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. §§ 321(k), (m).  The courts have long held that information need not be included with the actual drug product for it to be considered labeling.  See, e.g., Kordel, 335 U.S. at 347-48.  There, the manufacturer was found guilty of misbranding, where the product and the literature involved were shipped separately and at different times, but "had a common origin and a common destination," so the literature was held to accompany the drugs in interstate commerce within the meaning of the FDCA (21 U.S.C. section 321(m)) and to comprise a part of the "labeling."  The Supreme Court concluded: "[t]he fact that [the brochures] went in a different mail was *wholly irrelevant*."  Id. at 350 (emphasis added).

Harkonen takes far too narrow a view of what types of information or communications can be designed for use with the drug.  Information about what indications the drug may be effectively used to treat clearly falls within this provision; the communications need not transmit all details about dosages and methods of administration so as to usurp the role of the "directions for use" component of the drug label itself.  The test is whether the drug product and the information or communications are "interdependent."  Kordel, 335 U.S. at 346, 348.  Here, the communications as alleged promote the use of a product (Actimmune®) for a specific, unapproved indication (patients with mild to moderate IPF) with supplemental or explanatory guidance for its usefulness (to be used early in the course of treatment).  The results of the marketing firm research served to "supplement

15

1 or explain" that guidance and thus effectively also "accompanied" it and the product.  See id. at 350.
2 Accordingly, the communications as alleged indisputably satisfy the test and bear a textual
3 relationship to the product itself.  See id.; see also Urbuteit, 336 U.S. at 805.

4     It is not surprising that Harkonen cites no case to support the proposition he argues, that the
5 communications must substitute for the drug product label itself to function as labeling under the
6 FDCA, because that is not the law.  Contrary to Harkonen's assertion that the government is relying
7 on "an outmoded notion of statutory construction," both the FDA regulations and the case law make
8 clear that labeling under the FDCA is construed expansively, such that it may encompass nearly
9 every form of promotional activity, including package inserts, pamphlets, mailing pieces, fax
10 bulletins, reprints of press releases, and all other literature that supplements, explains, or is otherwise
11 textually related to the product.  For a review of this body of law, see Katherine A. Helm, Protecting
12 Public Health From Outside the Physician's Office:  A Century of FDA Regulation From Drug
13 Safety Labeling to Off-Label Drug Promotion, 18 Fordham Intell. Prop. Media & Ent. L.J. 117, 147-
14 157 (2007).

15     B.    Due Process Requirement for Fair Notice

16     As to Harkonen's fair notice argument, the court addresses both the FDA regulation on drug
17 promotion and the rule of lenity.  In the FDCA context, fair notice means that "criminal law is not to
18 be read expansively to include what is not plainly embraced within the language of the statute, since
19 the purpose fairly to apprise men of the boundaries of the prohibited action would then be defeated."
20 Kordel, 335 U.S. at 349 (citations omitted).

21     Here, Harkonen's argument that 21 C.F.R. section 312.7 protects, rather than proscribes, the
22 dissemination of scientific findings in press releases to the media is of no moment.  Not only does
23 the cited regulation provide no mention of the term "press release," but it also fails to provide a "safe
24 harbor" that could exempt the press release at issue from being included as labeling under the
25 FDCA.  Taken in its full context, the regulation makes abundantly clear that  promotion of an off-
26 label or pre-approved indication of a drug is prohibited and the press release at issue is not exempted
27 from liability by this regulation:

28     A sponsor or investigator, or any person acting on behalf of a sponsor or investigator,
    shall not represent in a promotional context that an investigational new drug is safe or

16

effective for the purposes for which it is under investigation or otherwise promote the drug. This provision is not intended to restrict the full exchange of scientific information concerning the drug, including dissemination of scientific findings in scientific or lay media. Rather, its intent is to restrict promotional claims of safety or effectiveness of the drug for a use for which it is under investigation and to preclude commercialization of the drug before it is approved for commercial distribution.

21 C.F.R. § 312.7(a).

As noted elsewhere in this Order, the indictment does not charge Harkonen with disseminating or exchanging scientific information in and of itself, but rather with disseminating information regarding Actimmune® for the treatment of IPF with the intent to defraud and mislead. Nothing in the FDCA or its corresponding regulations provide a "safe harbor" from these disseminating actions as alleged.

The rule of lenity does nothing to alter this conclusion. Due process principles only require that ambiguities be resolved against the government. See, e.g., United States v. Geborde, 278 F.3d 926, 932 (9th Cir. 2002). Here, there is no ambiguity that the issuance of the press release could form the basis for a mislabeling charge, based on the expansive construction of "labeling" under Kordel and the aforementioned cases in its orbit. Harkonen's arguments that the government will not be able to prove at trial the intent to defraud, do not support dismissal of the indictment based on the rule of lenity. The Ninth Circuit has expressly rejected the idea that courts may make pretrial determinations of the sufficiency of the evidence in criminal cases in the face of an otherwise valid indictment. See, e.g., Costello v. United States, 350 U.S. 359, 363 (1956); see also, United States v. DeLaurentis, 230 F.3d 659, 661 (3d Cir. 2000) (holding that dismissal under Rule 12 "may not be predicated upon the insufficiency of the evidence to prove the indictment's charges").

Accordingly, the court DENIES Harkonen's motion to dismiss the indictment on the basis that Harkonen has not moved to dismiss the first count, and the second count properly alleges misbranding, to the extent that it contains allegations of false and misleading promotional advertising of Actimmune® for an off-label use by Harkonen and others at InterMune.

Viewing the motion as a request to exclude evidence, however, the court GRANTS in limited part Harkonen's motion in limine and excludes the evidence relating to the T-shirt distribution to prove labeling. The T-shirts do not constitute labeling even under its broad construction of matter which "accompanies" the product in any form. 21 U.S.C. §§ 321(k), (m). The T-shirt distribution

17

was internal to InterMune employees only and was not designed for use in the distribution and sale of the drug, nor did it otherwise serve the "purposes of labeling" so as to "supplement or explain" Actimmune®'s intended use.  See Kordel, 335 U.S. at 350; United States v. Urbuteit, 335 U.S. 355, 357 (1948) (original ruling).  There was no integration between the shipment of the Actimmune® product and the distribution of the T-shirts, nor was there a common destination for the matter (sales staff v. prospective and actual patients and doctors).  Accordingly, the court excludes the evidence that Harkonen distributed T-shirts to InterMune sales staff and other employees at a party to celebrate the announcement of the GIPF-001 Phase III trial results as not constituting labeling under the FDCA.  Notably, this ruling does not prevent the government from offering the evidence for other purposes, e.g., to prove part of the marketing plan overall.

CONCLUSION

For the foregoing reasons, the court DENIES defendant's motion to dismiss the indictment or alternatively to exclude First Amendment-protected speech.  The court also DENIES defendant's motion to dismiss the indictment re "labeling," but GRANTS in limited part defendant's motion in limine to exclude certain evidence, as set forth above.

IT IS SO ORDERED.

Dated: June 3, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1. Unless otherwise noted, all facts are taken from the indictment against Harkonen, unless otherwise noted, and are not disputed for purposes of the instant motions. See U.S. v. Boren, 278 F.3d 911, 914 (9th Cir. 2002) ("In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment. . . .[and] the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged.")

2.  The court finds no meaningful distinction between speech (or the *content* thereof) and *conduct* (or dissemination) as argued by Harkonen. Repeated references to the government's assertion in United States. v. Caronia, 576 F. Supp. 2d 385, 395 (E.D.N.Y. 2008), that its use of speech as a proxy for conduct is exempt from First Amendment scrutiny, are unavailing here. The government is not trying to get protected speech in through back-door means by asserting the statements at issue are merely "evidence" of a crime Harkonen committed. Rather, the government contends the fraud charges turn on a series of communications, stemming from the press release and continuing with deceptive disseminations to doctors and to patients, all of which together constituted a scheme to defraud. These allegations involve both the content of speech (the press release and copies and excerpts thereof in writings) and conduct (dissemination of those items). Thus, Harkonen is wrong when he claims that "no conduct extrinsic to the speech is being prosecuted" because the government stated a conviction could be based upon both the press release and its disseminations. The court refers to both "speech" and "conduct" where appropriate in this Order.